SCHUMACHER WALL BOARD CORPORATION, PETITIONER, *v.* COMMIS-
SIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 61602, 69719. Promulgated February 26, 1936.

*Herman Phleger, Esq.*, and *T. R. Meyer, Esq.*, for the petitioner.
*H. B. Thomas, Esq.*, for the respondent.

OPINION.

ARUNDELL: These proceedings involve deficiencies in income tax
for the fiscal years ended April 30, 1929 and 1930, in the respective
amounts of $1,879.68 and $14,988.45. The issues concern the basis
for gain or loss and depreciation of assets, and depreciation rates
on machinery, buildings, and patents. Petitioner contends for a
basis of cost to it, whereas the respondent urges that the proper basis
is that of the petitioner's transferor.

The predecessor of the petitioner was incorporated in 1924 under
the laws of Delaware and was engaged in the manufacture of wall
board, with its principal office in Los Angeles, California. At the
beginning of 1926 its outstanding stock consisted of 10,000 shares
common and 790 shares preferred stock. The common stock was all
owned by a group of seven persons known as the Schumacher indi-
viduals. Three of the Schumacher individuals also owned a group
of patents relating to the manufacture of wall board.

On June 24, 1926, Hunter, Dulin & Co., a bond and underwriting
house, entered into a contract with the attorney for the Schumacher
individuals wherein it was agreed that the Schumacher individuals
would transfer all of their common stock and the patents to Hunter,
Dulin & Co. or to a corporation then in existence or one thereafter
to be formed. The consideration for these properties was the sum
of $1,546,300, of which $50,000 was to be paid within 30 days. Of
the balance of the purchase price, $86,900 was to be withheld by
Hunter, Dulin & Co. and used to retire the outstanding preferred
stock, and $100,000 was to be withheld and placed in trust to pay the
expenses of any litigation that might arise concerning the patents.

1212

On July 6, 1926, Hunter, Dulin & Co. caused the petitioner to be incorporated under the laws of Delaware with the same name as its predecessor company. The authorized capital stock of petitioner consisted of 30,000 shares of preferred and 60,000 shares of common stock, all without par value. The petitioner was organized for the purposes, among others, of acquiring the assets, business, and good will of the old Schumacher Corporation and the right to use the group of patents then owned by the Schumacher individuals.

On August 16, 1926, Hunter, Dulin & Co. notified the Citizens Trust & Savings Bank of Los Angeles, California, that within 48 hours it would hand the bank voting trust certificates representing 59,990 shares of the common stock and 18,750 shares of the preferred stock of the petitioner. The bank was directed to issue voting trust certificates representing 49,075 shares of the common stock and 18,750 shares of the preferred stock to three other companies against cash payments aggregating $1,190,334.

In order to effect the purposes for which the petitioner was organized, formal offers and acceptances passed between the various interested parties on August 17, 1926. They need not be set out in detail here. The several transfers and exchanges were made pursuant to the offers and acceptances and were all consummated on August 17, 1926, and as far as material here, they are set out in the following paragraph.

The Schumacher individuals transferred to Hunter, Dulin & Co. their 10,000 shares of stock in the old Schumacher Corporation and assigned to Hunter, Dulin & Co. their patents and certain licenses and received a net amount of $1,309,400. The petitioner issued all its 30,000 shares of preferred stock and 59,990 shares of its common stock to the old Schumacher Corporation in consideration of all the old corporation's assets and, of the old corporation's procuring the assignment to the petitioner of the aforesaid patents and licenses. The old corporation transferred 19,200 shares of the preferred stock and 38,390 shares of the common stock of the petitioner to Hunter, Dulin & Co. in consideration of Hunter, Dulin & Co. assigning the patents and licenses to the petitioner. The balance of the stock, 10,800 shares of preferred and 21,600 shares of common, was transferred by the old corporation to Hunter, Dulin & Co. for the promissory note of the latter in the amount of $545,762.85. The old corporation then dissolved and Hunter, Dulin & Co.'s note was acquired by Hunter, Dulin & Co. in the dissolution. No payment was ever made on the note. Hunter, Dulin & Co. placed the common stock in a voting trust, against which voting trust certificates representing 49,075 shares were issued and sold for cash to three other companies.

The same three companies also purchased from Hunter, Dulin & Co. 18,750 shares of the preferred stock of the petitioner.

Upon completion of the transactions set out in the preceding paragraph, neither the Schumacher individuals nor the old Schumacher Corporation had any interest in the petitioner, in Hunter, Dulin & Co. or in any of the companies that purchased preferred stock and voting trust certificates.

The net value of the assets acquired by the petitioner at August 17, 1926 was $1,800,000. The market value of the stock of the petitioner at the time of its issue and for at least six months thereafter was $1,800,000. The cost to the petitioner of the assets acquired from the old corporation and the patents acquired through Hunter, Dulin & Co. was $1,800,000. The patents acquired by the petitioner on August 17, 1926, had a value at that time and a cost to the petitioner of $712,000, and the average remaining life of the patents at that time was 10.9136 years. None of them expired prior to March 21, 1933.

Among the assets acquired by the petitioner from the old corporation was a plant at Los Angeles equipped for making wall board by what was known as the short belt method. By 1929 a process of manufacturing known as the long belt method had become established, which rendered the petitioner's short belt plant obsolete. In the fiscal year ended April 30, 1929, the petitioner scrapped part of the equipment of this plant and transferred part to a new plant. The cost of the equipment scrapped less depreciation was $152,177.83 and the petitioner received a salvage price of $250, making a loss to it of $151,927.83. Depreciation on the equipment scrapped was computed at the rate of 9 percent, which rate gives a reasonable allowance for depreciation. The buildings of the Los Angeles plant were not scrapped. They had a value when acquired by the petitioner of $81,525.50 and a useful life of from 15 to 18 years. A rate of 6 percent gives a reasonable allowance for depreciation of the buildings.

In determining the deficiencies in these proceedings, the respondent's theory was that the petitioner's basis for depreciation and gain or loss in respect of the properties acquired in 1926 was limited to the cost of the properties to the petitioner's predecessor. On this theory he held that cost to the predecessor of the assets abandoned or scrapped in 1929 had been fully depreciated prior to that time. He also scaled down the claimed basis for the patents from $712,000 to $574,781.27.

The respondent's theory rests upon his view that the assets were acquired "in connection with a reorganization" and therefore the petitioner must use the transferor's basis. Sec. 204 (a) (7), Revenue Act of 1926, and sec. 113 (a) (7), Revenue Act of 1928. The cited statutory provisions limit the basis to that of the transferor only

in those instances where "immediately after the transfer an interest or control in such property of 80 percent or more remained in the same persons." If the required 80 percent interest or control does not persist, it does not matter whether or not there was a statutory reorganization. Both elements prescribed by the cited sections must be present if those sections are to apply. *Spang-Chalfant & Co.*, 31 B. T. A. 721; *Metropolitan Ice Co.*, 32 B. T. A. 588. In these cases the physical assets were acquired from the old Schumacher Corporation. That corporation, it is true, received all the stock of the petitioner, but its receipt was only for the purpose of passing the stock on to Hunter, Dulin & Co. "The interest or control referred to in Section 113 (a) (7), Revenue Act of 1928 [and 204 (a) (7), Revenue Act of 1926] * * * means beneficial ownership." *Metropolitan Ice Co., supra.* "* * * the question of control is to be determined by the situation existing at the time of the completion of the plan rather than at the time of the fulfillment of one of the intermediate steps." *Wilbur F. Burns*, 30 B. T. A. 163, 172. Cf. *Omaha Coca-Cola Bottling Co.*, 26 B. T. A. 1123; *Charles Hall*, 31 B. T. A. 125. The facts here are much like those in *Hazeltine Corporation*, 32 B. T. A. 4, and 32 B. T. A. 110. In those cases the old corporation received more than 96 percent of the stock of the new corporation but it was under contract to, and did, transfer all but 12 percent to the investment firm that promoted the deal. We there held, citing *West Texas Refining & Development Co.* v. *Commissioner*, 68 Fed. (2d) 77, that the new corporation was not limited to the basis of the old, but was entitled to use cost as the basis. Applying the principles of the above cases, we hold here that the petitioner's basis applicable to the assets acquired from the old corporation is not governed by the cited statutory provisions, but that its basis is cost. Sec. 113 (a), Revenue Act of 1928. The same situation applies with respect to the patents. While they came to the petitioner ostensibly from Hunter, Dulin & Co., the real transferors were the Schumacher individuals, who had no interest in or control over the patents upon completion of the transactions on August 17, 1926. But even if Hunter, Dulin & Co. be regarded as the transferor of the patents, it did not, under the principles of the cases cited above, retain an 80 percent interest. On the same day that it acquired the stock of the petitioner, and as a part of the general plan, it sold the majority of preferred stock and voting trust certificates against 49,075 shares of the common stock to three other concerns for cash. Consequently, the petitioner's basis for the patents, as for the other assets, is cost.

The consideration paid by the petitioner for the assets of the old corporation and the patents was stock, and the cost is the value of

                                                   1215

the stock. *Hazeltine Corporation*, 32 B. T. A. 110, 120. Petitioner's claim of a value for the stock of $1,800,000 is supported by sales of substantial amounts of stock, preferred and common, on the San Francisco Stock Exchange beginning with August 1926 and for several months thereafter. It is also supported by evidence of the value of the assets acquired. Qualified witnesses testified as to the values of the properties here involved, the useful life, and the proper rates of depreciation. The respondent offered no evidence to the contrary.

We find as the ultimate facts material to the decision of the issue here that the patents acquired by the petitioner on August 17, 1926, cost it $712,000 and that they had an average useful life of 10.9136 years; that the cost to the petitioner of equipment scrapped in 1929, less depreciation to date of scrapping was $152,177.83; that the buildings of the Los Angeles plant had a cost to petitioner of $81,525.50 and that a proper rate of depreciation is 6 percent per annum.

The foregoing facts will permit a recomputation to be made by the parties, of the petitioner's tax liability for each of the years.

An issue raised by the pleadings concerning claimed deductions for payments to Buttress Manufacturing Co. was treated indifferently at the trial and is not argued on brief. In their reply brief counsel for petitioner says "it is not of particular importance." We do not decide it.

*Judgment will be entered under Rule 50.*